UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| SHARON L. LISTENBERGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:05-CV-00384 |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Sharon L. Listenberger appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying Listenberger's application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (*See* Docket # 4.)  For the reasons set forth herein, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Listenberger applied for DIB on November 15, 2002, alleging that she became disabled as of February 7, 2000. (Tr. 37.)  The Commissioner denied her application initially and upon reconsideration, and Listenberger requested an administrative hearing. (Tr. 20, 25.)  On December 2, 2004, Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Listenberger, who was represented by counsel, her daughter, and a vocational expert testified. (Tr. 351-79.)  On February 25, 2005, the ALJ rendered an unfavorable decision to

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

Listenberger, concluding that she was not disabled because she could perform her past relevant work. (Tr. 8-19.)  The Appeals Council denied Listenberger's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-7.)

Accordingly, Listenberger filed a complaint with this Court on November 2, 2005, seeking relief from the Commissioner's final decision. (Docket # 1.)  This appeal became ripe for the Court's review as of June 13, 2006. (*See* Docket # 13-20.)

## II.  THE PARTIES' POSITIONS

Listenberger points to four errors in the Commissioner's final decision.  Listenberger claims that the ALJ erred by: (1) improperly evaluating her ability to perform her past relevant work at step four; (2) failing to have her undergo an additional psychological evaluation to administer intelligence testing; (3) discounting the credibility of her testimony of debilitating limitations; and (4) improperly considering the opinions of Dr. Nilda Salazar, a psychiatrist who treated Listenberger briefly, and Rosalind Huang, Ph.D., an examining psychologist. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") at 19-23.)  In addition, Listenberger asserts that her claim should be remanded under the sixth sentence of Section 405(g) of the Act because she has new evidence: (1) a medical source statement completed by Dr. Robert Wilkens, her general practitioner, three days after the ALJ rendered his opinion; and (2) a psychological evaluation performed by Sherwin Kepes, Ph.D., a psychologist who examined Listenberger two months after the ALJ rendered his opinion. (Opening Br. at 24-25.)

The Commissioner, however, argues that substantial evidence supports the decision to deny Listenberger a period of disability.  The Commissioner contends that the ALJ did not commit an error that necessitates a remand when considering Listenberger's past work at step

2

four, and that the ALJ did not abuse his discretion by rendering his opinion without asking Listenberger to undergo additional psychological testing. (Mem. in Supp. of the Commissioner's Decision at 9-13.)  Likewise, the Commissioner asserts that the ALJ properly determined the credibility of Listenberger's testimony of debilitating limitations and properly considered the opinions of Dr. Salazar and Dr. Huang. (Mem. in Supp. of the Commissioner's Decision at 13-15.)  Finally, the Commissioner asserts that a remand for consideration of additional evidence is not warranted, as Dr. Kepes's report is not material and Listenberger has failed to show good cause for her delay in producing it.[2] (Mem. in Supp. of the Commissioner's Decision at 16-19.)

### III.  FACTUAL BACKGROUND[3]

#### 1.  Background and Daily Activities

At the time of the hearing, Listenberger was fifty-five years old and had a ninth grade education.[4] (Tr. 37, 52, 351, 354.)  Her past work experience included: laundry folder (full-time) from 1981 to 1997, from which she was terminated due to a conflict with a supervisor; newspaper deliverer (part-time) from 1997 to 2004, which she quit due to low profitability; and breakfast person (part-time), which she began in 2004 and was still performing at the time of the hearing.[5] (Tr. 47, 85, 135, 362.)  Listenberger alleged in her DIB application that she became

---

[2] The Commissioner did not address the medical source statement from Dr. Wilkins in its response brief. (*See* Mem. in Supp. of the Commissioner's Decision at 16-19.)

[3] The administrative record in this case is voluminous (379 pages), and the parties' disputes involve only small portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

[4] Listenberger stated that after the fourth grade, she was placed in special education classes for a period of time, explaining that she was "behind and couldn't do the regular work." (Tr. 354-55.)

[5] Listenberger stated that in 2004 she attempted a housekeeping job at the hotel where she now works as a breakfast person, but that she could not sustain it seven hours per day because it involved "[d]oing the rooms, lifting blankets, making beds and cleaning bathrooms. . . ." (Tr. 360.)

disabled as of February 7, 2000, due to hip and leg pain, arm and hand pain, bowel and bladder incontinence, and depression. (Tr. 46.)

At the hearing, Listenberger stated that she lived alone, spending three and one-half hours per day working as a breakfast person at a hotel and the rest of the day cleaning her house.[6] (Tr. 364-66.)  She reported that she independently drives, performs her self care, and completes her housework, although on weekends her grandson at times helps with heavier tasks. (Tr. 364-66, 370.)  In performing her housework, Listenberger stated that she incorporates frequent rest periods. (Tr. 365-71.)  Socially, Listenberger explained that she frequents church activities regularly and visits with her daughter and grandchildren. (Tr. 367-68, 371.)

When asked if she was having problems with pain, Listenberger responded affirmatively, but stated that it was "[n]ot as much as it was when [she] was doing rooms," referring to her brief stint in 2004 as a hotel housekeeper. (Tr. 361.)  When asked to describe her pain, she explained that she "*was* having pains in [her] hips and arms, all over, [and] her feet," that "[i]t *was* real sharp pain," and  "it *was* a 10" on a ten-point scale. (Tr. 361 (emphasis added).)  She explained that this pain was aggravated by "standing in housekeeping, lifting blankets, . . . bending over doing beds, making beds and getting on the floor to clean the floor . . . ." (Tr. 361.)  She explained, however, that her leg and arm pain currently was "going a little bit better than what it was," as it was "down [to] about a five." (Tr. 365.)  Nonetheless, at another point in her

_____

Also, at one point in the record, Listenberger stated that she left her job as a laundry folder and started her work as a newspaper deliverer in 1999, rather than 1997. (Tr. 85.)  However, for the Court's purposes here, it does not matter.

[6] In fact, when asked to describe the activities she performed in the day immediately preceding the hearing, Listenberger explained that her housework included moving a couch that weighed one hundred pounds so that she could set up her Christmas tree. (Tr. 366.)

4

testimony, she stated that the pain in her right arm currently was a level "eight" and had been so

for "the last couple of years." (Tr. 363-64.)

　　When asked what kind of things she tried to do to relieve or avoid her pain, Listenberger

stated that on the job she "tried to sit down" some of the time, and at home she "lay[s] down and

put[s] [her] feet up." (Tr. 361-62.)  She also said she "took some pain pills that [she] ha[s] at

home" but that she did not remember what type of medication it was. (Tr. 362.)

　　As to her physical capacity, Listenberger stated that she could lift no more than five

pounds, could sit uninterrupted for thirty minutes to an hour, could stand for thirty minutes to an

hour at a time, and could walk one block before needing to rest. (Tr. 362-63.)

## 2. *Relevant Medical History*[7]

　　On July 22, 2001, Listenberger was admitted to Parkview Behavioral Health Center,

complaining of suicidal ideation and depression. (Tr. 327-34.)  Dr. Nilda Salazar, a psychiatrist,

performed a mental status examination, noting that Listenberger spoke in a low tone of voice, but

in a coherent and relevant manner. (Tr. 328.)  Listenberger explained that she had felt depressed

on and off for the past year, but that it had recently become worse. (Tr. 327.)  Dr. Salazar noted

that Listenberger's affect was flat, that her mood was depressed, and that she became tearful

when she talked of having little family support in her life. (Tr. 328.)  Listenberger also confided

that she used marijuana. (Tr. 329.)  Dr. Salazar diagnosed Listenberger with major depression,

---

[7] The record indicates that Listenberger has a history of hypertrophic lumbar spondylosis with degenerative disc changes, bowel and bladder incontinence, an ankle fracture in 2003, and three left hip arthroplasties (the most recent being in 2001) as a result of a congenital deformity of the femur. (*See* Tr. 13-17.)  However, since Listenberger's appeal pertains solely to the ALJ's findings with respect to her alleged mental impairments, not her physical impairments, the Court will articulate only the medical evidence relevant to Listenberger's alleged mental impairments.

single episode, without psychosis, and cannabis abuse, and assigned a GAF score of forty-five.[8] (Tr. 329.)  Listenberger was then started on Zoloft. (Tr. 329.)

Just three days later, Listenberger was discharged from Parkview Behavioral Health Center. (Tr. 325.)  Upon discharge, Dr. Salazar opined: "With the inpatient treatment milieu and medication monitoring the patient improved to the point of asking to be discharged on July 25, 2001.  The patient denied any thoughts of suicide.  She said that staying briefly in the hospital really helped with her depression.  She was eager to be discharged so she could resume her paper route." (Tr. 325.)  Dr. Salazar then concluded that Listenberger had "[i]mproved over admission" and that her prognosis was "[s]omewhat good as she showed great motivation to get help after this hospitalization." (Tr. 325-26.)

On August 9, 2001, Listenberger was evaluated by Dr. Peter Burns, a psychiatrist at Park Center, for follow up care from her recent hospitalization. (Tr. 185-86.)  Listenberger told Dr. Burns that her depression dated back twenty years but had intensified in the prior month when a significant relationship ended. (Tr. 185.)  She stated that she had difficulty sleeping, experienced decreased energy, reduced concentration, reduced appetite, and intermittent suicidal thoughts. (Tr. 185.)  She also reported that she used marijuana on the weekends. (Tr. 185.)  On mental status examination, Dr. Burns observed that her appearance was appropriate and that her gait was normal. (Tr. 186.)  While he noted that her speech was also normal, he found that her judgment and insight were limited. (Tr. 186.)  He observed that she reported no hopeless or helpless

---

[8] Global Assessment of Functioning (GAF) is a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning on a hypothetical continuum of mental health illness; the GAF excludes any physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).  A GAF score of forty-five means an individual is experiencing serious symptoms or has a serious impairment in social, occupational, or school functioning. *Id.*

feelings and that her affect was within the normal range. (Tr. 186.)  He continued her Zoloft and prescribed Trazodone to help her sleep. (Tr. 186.)

On December 20, 2001, Listenberger returned to see Dr. Burns, reporting that the Zoloft had lessened her depression and that her sleep had improved.[9] (Tr. 181.)  He noted that her appearance and behavior were appropriate, and that her speech, affect, insight, and judgment were normal. (Tr. 181.)  Her prescriptions for Zoloft and Trazodone were continued. (Tr. 181.)

On March 14, 2002, Listenberger visited Dr. Mladen Hauptfeld at Park Center, who opined that Listenberger was stabilized on her medications. (Tr. 180.)  While she complained of occasional depressive feelings, Listenberger stated that they were not as bad or as frequent as they had been in the past. (Tr. 180.)  On mental status examination, Listenberger presented as coherent, oriented without psychotic symptomology or suicidal ideation, and properly oriented in all spheres. (Tr. 180.)  She denied the use of any illegal substances. (Tr. 180.)

On June 27, 2002, Listenberger was seen by Dr. Gregory Allen at Park Center. (Tr. 179.) At this visit, Listenberger reported only fair or moderate relief from her depression, with continued restless sleep. (Tr. 179.)  Dr. Allen noted that she was cooperative, direct, alert, had a steady gait, and demonstrated good eye contact, exhibiting no psychosis, suicidal ideation, or crying spells.  Her Zoloft was increased, and she was also advised to consider counseling. (Tr. 179.)

On August 9, 2002, Listenberger was seen by Dr. Paul Lawler at Park Center. (Tr. 178.)

---

[9] While the medical records of Peter Burns, Mlade Hauptfeld, Gregory Allen, and Peter Lawler during the period of December 2001 to August 2002 reflect a title of "therapist," it is clear from the content of their notes, the signatures in certain notes, and Park Center's September 26, 2003, discharge summary stating that Listenberger had "only received services from the doctor," that these individuals were Listenberger's treating physicians at Park Center. (*See* Tr. 178-81, 314.)

Dr. Lawler decreased her Trazodone and Zoloft, as Listenberger complained of fatigue and a "hangover" feeling from the medications. (Tr. 178.)  He explained to Listenberger that her irregular sleep could be age-related and that "it has to be accepted by her." (Tr. 179.)  He concluded that "[a]ll in all, she show[ed] no evidence of mental illness and one wonders whether she needs to stay on the Zoloft o[r] even the Trazodone, and in its place she could take something such as Benadryl which acts as a sedating drug." (Tr. 179.)

Over a year later, on September 26, 2003, Listenberger was discharged from Park Center due to noncompliance. (Tr. 314.)  The discharge summary noted that she had responded well to Zoloft, but that she "would be appropriate for low intensity services if she chose to follow through with scheduled appointments." (Tr. 314.)

On January 18, 2003, Listenberger underwent a mental status evaluation administered by Rosalind Huang, Ph.D., at the request of the Social Security Administration. (Tr. 191-94.)  She noted that Listenberger had self-deprecating thoughts and that her concentration and memory were weak. (Tr. 191.)  Listenberger denied the use of any substances. (Tr. 192.)   Dr. Huang diagnosed Listenberger with a major depressive disorder, moderate, and assigned her a GAF score of fifty.[10] (Tr. 194.)

On January 30, 2003, J. Gange, Ph.D., a state agency psychologist, reviewed Listenberger's medical record and determined that she did not have a severe mental impairment. Specifically, she opined that Listenberger had no limitation in activities of daily living or social functioning; no episodes of decompensation of extended duration; and only mild difficulties in

---

[10] A GAF score of fifty means an individual is experiencing serious symptoms or has a serious impairment in social, occupational, or school functioning. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).

maintaining concentration, persistence, or pace as a result of her mental impairment. (Tr. 213.)
This opinion was later affirmed by another state agency psychologist. (Tr. 203.)

### 3.  Summary of Vocational Expert Testimony

Vocational expert Robert Bond testified at the hearing. (Tr. 372-79.)  The ALJ asked
Bond if any of Listenberger's past relevant work, either as she performed it or as it is described
in the Dictionary of Occupational Titles ("DOT"), would be available for a hypothetical
individual who is the same age and has the same education and work background as
Listenberger, who is limited to light work. (Tr. 373.)  In response, Bond stated that such an
individual could perform Listenberger's past jobs as a breakfast person and newspaper deliverer
either as she performed them or as they are described in the DOT, and could also perform her
past job as a laundry folder as it is described in the DOT. (Tr. 373-74.)

### 4.  The ALJ's Decision

On February 25, 2005, the ALJ rendered his opinion. (Tr. 11-19.)  He found at step one
of the five-step analysis that Listenberger had not engaged in substantial gainful activity since
her alleged onset date, and at step two that she had severe impairments with respect to her
hypercholesterolemia, gastroesophageal reflux disease, status post left hip surgeries including
multiple total hip arthroplasties and/or revisions, status post left ankle fracture and status post
open reduction and internal fixation of that fracture, status post removal of left ankle hardware,
and bladder and bowel incontinence. (Tr. 13, 15, 18.)  However, at step three, he determined that
Listenberger's impairments were not severe enough to meet a listing. (Tr. 15-16, 18.)  Before
proceeding to step four, the ALJ determined that Listenberger had the residual functional
capacity ("RFC") to perform a full range of light work. (Tr. 17, 19.)  Based on this RFC, at step

four the ALJ concluded in his findings that Listenberger could perform her past relevant work as a breakfast person, newspaper deliverer, and a laundry folder.[11] (Tr. 19.)  Therefore, Listenberger's claim for DIB was denied. (Tr. 18-19.)

## IV.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." 42 U.S.C. § 405(g).  The ALJ's decision must be sustained if it is supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Id.*

Under this standard, the Court reviews the entire administrative record, but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## V.  THE LAW

To be considered disabled under the Act, a claimant must establish that she is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12

---

[11] While the ALJ concluded in his findings that Listenberger could perform her past work as a laundry folder, he did not expressly conclude so in the body of his opinion (*see* Tr. 18-19); this is the subject of Listenberger's first argument, which will be discussed *infra* in Section VI(A).

months." 42 U.S.C. § 416(i)(1); 42 U.S.C. § 423(d)(1)(A).  The impairment must be severe, causing the claimant to be unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 405.1505-1511.

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[12] 20 C.F.R. § 404.1520; *see also Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*  The burden of proof lies with the claimant on every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## VI.  ANALYSIS

### A.  The ALJ's Step Four Finding Does
### Not Serve as a Basis for a Remand

First, Listenberger asserts that the ALJ erred at step four when evaluating her ability to perform her past relevant work.  Specifically, she contends that the ALJ erred by concluding that

---

[12] Before performing steps four and five, the ALJ must determine the claimant's RFC, or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

her jobs as a breakfast person and a newspaper deliverer were past relevant work, since he stated earlier in his opinion that these jobs did not constitute substantial gainful activity.  Listenberger further argues that the ALJ articulated inconsistent findings by stating in the body of his opinion that she could perform her past work as a breakfast person and a newspaper deliverer, but concluding in his findings that she could *also* perform her past work as a laundry folder.

As to Listenberger's first argument – that the ALJ erred by stating at step one that her work as a breakfast person and a newspaper deliverer did not constitute substantial gainful activity, but concluding at step four that they constituted past relevant work, Listenberger is correct, or at least partially so.  The Seventh Circuit Court of Appeals has stated: "[W]e are simply unable to discern anything in the proffered regulation to suggest that prior non-substantial gainful activity can be the basis for a step four determination of non-disability." *Lauer v. Bowen*, 818 F.2d 636, 641 (7th Cir. 1987); SSR 82-62.

At step one, the ALJ concluded that Listenberger had not engaged in substantial gainful activity since her alleged onset date because the wages she earned as a breakfast person and a newspaper deliverer after her alleged onset date did "not meet or exceed the substantial gainful activity guidelines." (Tr. 13.)  Therefore, when the ALJ later concluded that Listenberger's work as a breakfast person, which she performed solely after her alleged onset date, could be considered past relevant work, he clearly erred.  Whether Listenberger's work as a newspaper deliverer could properly be considered past relevant work, however, is less clear, since she performed it both before *and* after her alleged onset date.  Ultimately, however, the ALJ's error concerning her work as a breakfast person is harmless and the quandary regarding her work as a newspaper deliverer does not matter, because the ALJ concluded in his findings that

Listenberger could *also* perform her past relevant work as a laundry folder, a full-time job that she held before her alleged onset date.

This serves as a segue to Listenberger's second argument – that the ALJ made inconsistent findings by stating in the body of his opinion that she could perform her past work as a breakfast person and newspaper deliverer, but stating in his findings that she could *also* perform her job as a laundry folder.  At the hearing, the vocational expert testified that a hypothetical individual with Listenberger's RFC could perform her past relevant work as a breakfast person and newspaper deliverer either as she performed it or as it is defined in the DOT, and could *also* perform her past work as a laundry folder as that job is defined in the DOT. However, despite this testimony by the vocational expert, in the body of his opinion the ALJ omitted the vocational expert's reference to Listenberger's past work as a laundry folder when he stated: "Based on the testimony of the vocational expert, the undersigned finds that the claimant can return to her past relevant work as a breakfast person and a newspaper deliverer both as she performed those jobs and as they are generally performed in the national economy." (Tr. 18.)  In contrast, the ALJ later opined in his findings: "The claimant is able to perform her past relevant work as a breakfast person, a newspaper deliverer *and a laundry folder*." (Tr. 19 (emphasis added).)

Here, because the vocational expert testified that a hypothetical individual with Listenberger's RFC could perform her past work as a laundry folder as it is performed in the national economy, *see* 20 C.F.R. § 404.1560(b)(2) (stating that a claimant is not disabled if she is able to perform her past relevant work, "either as the claimant actually performed it *or* as generally performed in the national economy") (emphasis added); SSR 82-61, and since the ALJ

stated in his findings that she could return to her job as a laundry folder, the ALJ's failure to include this job in the body of his opinion is mere harmless error and does not warrant a remand. *Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination); *Smith v. Barnhart*, No. 05 C 0026 C, 2005 WL 1785273, at *12 (W.D. Wis. July 27, 2005) (finding ALJ committed harmless error at step five by opining that claimant's short-term work attempt allowed him to acquire certain vocational skills, articulating that "it would be pointless to remand this case because there is other, substantial evidence in the record that supports the ALJ's step five determination").  As a result, Listenberger's first argument is unavailing.

> B.   *The ALJ Did Not Err By Rendering His Decision Without Having*
> *Listenberger Undergo an Additional Psychological Examination*

Listenberger next contends that the ALJ erred by failing to have her undergo an additional psychological examination to administer intelligence testing that her attorney requested twenty-four days prior to the hearing, suggesting that perhaps she has mild mental retardation. (Opening Br. at 20.)  Like her first argument, Listenberger's second basis to overturn the ALJ's decision is unsuccessful.

A claimant has the initial duty to bring forth evidence supporting a finding of disability, 20 C.F.R. § 404.1512(a); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004), and when a claimant is represented by counsel at the administrative hearing, the ALJ is entitled to presume that the claimant has advanced her best grounds for recovery, *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988).  The ALJ has the discretion then to determine whether the evidence put forth by the claimant is adequate to decide the issue of disability or whether further consideration by a medical expert is required. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (citing 20

14

C.F.R. § 404.1527(f)(2)(iii)); *see also* 20 C.F.R. § 404.1512(f). "[B]ecause it is always possible to identify one more test or examination an ALJ might have sought, the ALJ's reasoned judgment of how much evidence to gather should generally be respected." *Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004).

Here, the ALJ did not err by rendering his opinion without seeking the opinion of an additional psychological expert. Listenberger was represented by counsel at the hearing and was thus presumed by the ALJ to have advanced her best case. *See Sears*, 840 F.2d at 402. The record contains evidence submitted by numerous psychiatrists and psychologists who evaluated Listenberger or reviewed her medical record – Dr. Salazar, Dr. Burns and other Park Center psychiatrists, Dr. Huang, and Dr. Gange – none of whom assigned her a diagnosis of mild mental retardation or recommended that she undergo intelligence testing. If Listenberger wanted to advance mild mental retardation as a basis for her disability, it was her duty to present evidence adequate to support such a finding, *see* 20 C.F.R. § 404.1512(a); *Scheck*, 357 F.3d at 702; here, she has failed to do so.[13] The ALJ apparently determined that the evidence before him was adequate to determine the severity of Listenberger's mental impairment, and in light of the record presented, he did not abuse his discretion by doing so. Accordingly, the ALJ's decision will not be remanded on this basis.

### C. The ALJ Did Not Err in Discounting the Credibility of Listenberger's Testimony

---

[13] While Listenberger asserts that determining her intelligence level is relevant to whether she could return to her past relevant work as a laundry folder, a claimant's education is considered at step five, not step four. 20 C.F.R. § 404.1560(b)(3) (articulating that in determining at step four whether a claimant can return to her past relevant work, "[w]e will not consider your vocational factors of age, education, and work experience or whether your past relevant work exists in significant numbers in the national economy.").

Listenberger next argues that the ALJ's determination that her testimony of debilitating limitations was "not fully credible" was not supported by substantial evidence. (Tr. 16.) Specifically, she asserts that the ALJ erred by (1) concluding that her performance of part-time work was inconsistent with her testimony of limitations; (2) failing to explain "why the use of marijuana distracts from her credibility" (Opening Br. at 22); and (3) determining the credibility of her testimony without obtaining an additional psychological evaluation to administer intelligence testing.  While one of Listenberger's arguments has merit, the ALJ's determination is still supported by other substantial evidence, and accordingly, the ALJ's credibility determination will not be disturbed.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Shramek*, 226 F.3d at 811, his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Here, the ALJ considered Listenberger's testimony of debilitating limitations to be "inconsistent with the objective medical evidence of record, her treatment history and . . . [her] continuing work activities." (Tr. 16.)  More specifically, the ALJ opined:

16

The claimant's documented impairments undoubtedly produce some symptoms of the general type described, however, there is no consistent reliable, objective medical evidence that the claimant has a severe mental impairment.  In fact, her treating psychiatrist concluded on August 18, 2002 that she had no evidence of mental illness and it was questioned whether she even required the medications she was taking.  The claimant's impairments do not prevent the claimant from routinely performing daily activities that include caring for her personal needs, grocery shopping, cleaning her house and even working on a daily basis as a breakfast person at the Country Inn where she works three and one-half hours a day every day.  In addition, the claimant has had three jobs since she alleged an inability to work due to her impairments. . . . While she quit the delivery job in 2004, the reasons for quitting were not related in any way to her impairments.  She quit because it was no longer profitable to work at that job since many of her most profitable routes had been cut by the newspaper.  When the claimant was examined and evaluated by Dr. Kancherla in 2003, the doctor found that the claimant could dress and undress and get on and off the examining table without difficulty.  She could recline flat, sit up and partially squat.  While she had a limited range of motion in her lumbar spine, range of motion in her knees and other joints was normal although painful in her left hip.  Even though she had surgery on her fractured ankle, . . . she had good ankle range of motion with few symptoms in that joint. In addition, in several reports she denied any use of illegal drugs, however, her medical records show that she had been smoking marijuana on a regular basis.  She conceded to Dr. Burns when she saw him on August 9, 2001 that she had recently been diagnosed with a substance abuse disorder related to her marijuana use and had just used marijuana the weekend before he saw her for that visit.

(Tr. 16 (internal citations omitted).)

In contrast to Listenberger's first assertion, the ALJ did not error when he considered her performance of part-time work after her alleged onset date in his credibility determination.  It is proper for an ALJ to consider a claimant's daily activities as a factor when assessing the credibility of a claimant's complaints. 20 C.F.R. § 404.1529(c); SSR 96-7p.  Here, the ALJ properly considered as a factor in his analysis that Listenberger worked part-time as part of her daily routine, in addition to performing personal care tasks, household chores, and shopping, but did not improperly equate her part-time work with an ability to work full-time. *Compare Schmidt v. Barnhart*, 395 F.3d

17

737, 746-47 (7th Cir. 2005) (considering claimant's performance of daily activities as a factor when discounting claimant's credibility), *and Scheck*, 357 F.3d at 703, *with Mendez v. Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006) (cautioning ALJs "against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home"), *and Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005).  Thus, the ALJ's consideration of her part-time work activities was without error.

Likewise, Listenberger's third argument – that the ALJ erred by determining her credibility without obtaining an additional psychological examination – misses the mark. As discussed *supra* in Section VI(B), the ALJ did not err by rendering his decision without having Listenberger undergo an additional psychological examination.  As a result, this argument fails in the context of challenging her credibility determination as well.

However, Listenberger's second contention concerning the ALJ's consideration of her marijuana use does have merit, but not for the reason advanced by Listenberger. In contrast to her characterization of the ALJ's opinion, the ALJ did *not* dash Listenberger's credibility merely because she used marijuana; rather, the ALJ highlighted a perceived inconsistency in Listenberger's statements about whether she used illegal substances.  The ALJ was entitled to consider any inconsistency in her statements in arriving at his credibility determination. *See* 20 C.F.R. § 404.1529(c); SSR 96-7p. However, here the ALJ appeared to misconstrue the evidence of record concerning her marijuana use.

18

In 2001 Listenberger admitted to using marijuana on weekends, but in 2002 and 2003, she denied any use of illegal substances. (*See* Tr. 180, 185, 187, 192, 314, 320, 321, 324, 332, 333.)  Thus, it is reasonable to infer that she indeed may have changed her ways by 2002.  Before he negatively inferred that Listenberger was inconsistent in her statements, the ALJ should have asked her if she stopped using marijuana at a particular point in time.[14] *See* SSR 96-7p ("When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements."); *Wates v. Barnhart*, 274 F. Supp. 2d 1024, 1040 n.9 (E.D. Wis. 2003) ("[T]he ALJ should not have drawn an adverse inference with respect to [a claimant's] credibility without making additional inquiry under SSR 96-7p.").  Thus, the ALJ's reliance upon her statements regarding marijuana use as a means to discredit her was in error.

Nonetheless, while one of Listenberger's three credibility arrows hits the mark, it is simply not enough to cause her to win the match.  Setting aside the reference to her statements regarding marijuana use, the ALJ's determination that Listenberger's testimony was "not fully credible" is still supported by other substantial evidence, as the ALJ *also* relied upon, and gave specific examples of, (1) an inconsistency between her daily activities and her testimony of limitations, and (2) a lack of objective medical evidence to support her alleged psychological and physical impairments.  Clearly, the

---

[14] The ALJ misconstrued the record when he stated that Listenberger "had just used marijuana the weekend before [Dr. Burns] saw her" after recently being diagnosed with a substance abuse disorder. (Tr. 17.)  Rather, the record reflects that Listenberger denied to Dr. Burns that she used marijuana the weekend before her visit, reporting that the last time she used it was "last month." (Tr. 321.)

ALJ built an accurate and logical bridge between the evidence and his conclusion, and his reasoning is not patently wrong.  Accordingly, his credibility determination will not be overturned.

### D.  The ALJ's Consideration of the Opinions of Dr. Salazar and Dr. Huang Is Supported by Substantial Evidence

Listenberger next asserts that the ALJ erred in discounting the opinions of Dr. Salazar, who treated her during a three-day hospital stay in July 2001, and Dr. Huang, who administered a consultative psychological examination.  Contrary to Listenberger's assertion, however, the ALJ's decision to discount the opinions of Dr. Salazar and Dr. Huang is supported by substantial evidence.

The Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).  However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).[15]  Furthermore, a claimant is not entitled to DIB simply because his treating physician states that he is "unable to work" or "disabled," *Clifford*, 227 F.3d at 870; the determination of

---

[15] In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

disability is reserved to the Commissioner. *Id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir.

1995); *see also* 20 C.F.R. § 404.1527(e)(1).  Regardless of the outcome, the Commissioner must

always give good reasons for the weight ultimately applied to the treating source's opinion.

*Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).

Applying this legal standard first to Dr. Salazar's opinion, it is clear that the

ALJ's decision to discount her opinion was well-grounded.  In assessing Dr. Salazar's

opinion, the ALJ specifically explained:

> The opinions of Dr. Salazar who diagnosed the claimant with a major
> depressive disorder with a GAF score of 45, are not at all consistent with the
> claimant's longitudinal record.  While she did go to the hospital on two different
> occasions with complaints of mental stress, she stayed only a short period of time
> on each visit and had a quick recovery after each visit.  The remainder of the
> claimants' medical record does not support the doctor's conclusion that the
> claimant has a severe mental disorder. . . .

(Tr. 17.)  Here, the ALJ pointed out that Dr. Salazar's opinion was not reflective of

Listenberger's overall functioning because it did not represent a "longitudinal" picture of her

mental status. *See* 20 C.F.R. § 404.1527(d)(2); *Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir.

1994).  Dr. Salazar only treated Listenberger briefly as an inpatient in 2001, noting upon her

discharge that she had "improved to the point of asking to be discharged." (Tr. 325.)

Listenberger never saw Dr. Salazar again.

Instead, the ALJ adopted the more recent opinion of one of Listenberger's treating

psychiatrists from Park Center, where she received mental health care after her brief 2001

hospitalization through August 2003.  In his August 13, 2002, progress note, Dr. Lawler of Park

Center stated that Listenberger's "progress [was] good" and that "[a]ll in all, she shows no

evidence of mental illness and one wonders whether she needs to stay on the Zoloft o[r] even the

Trazodone . . . ." (Tr. 178.)  This really is not surprising, as Dr. Salazar noted at the time of Listenberger's discharge from the hospital that "[Listenberger] said that staying briefly in the hospital really helped with her depression [and] [s]he was eager to be discharged so she could resume her paper route," further opining that Listenberger had "[i]mproved over admission" and that her prognosis was "[s]omewhat good as she showed great motivation to get help after this hospitalization." (Tr. 325-26.)  Therefore, the ALJ's discounting of Dr. Salazar's dated opinion and his adoption of the more recent opinion from Listenberger's treating physician at Park Center is supported by substantial evidence. *See Luna v. Shalala*, 22 F.3d 687, 690 (7th Cir. 1994) (finding the most pertinent medical evidence to be the most recent treating physician's examination even though claimant's medical history showed significant history of back problems pre-dating such opinion).

In that same vein, since he assigned greater weight to the most recent opinion of Listenberger's treating physicians at Park Center who were most familiar with Listenberger's "longitudinal record" (Tr. 17), the ALJ accordingly did not choose to assign great weight to the opinion of Dr. Huang, the consulting psychologist.  Dr. Huang assigned Listenberger a GAF score of fifty, which was inconsistent with the most recent examination by Listenberger's treating psychiatrists at Park Center, as well as the opinion of the state agency physicians who reviewed her medical record. *See Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) ("Medical evidence may be discounted if it is . . . inconsistent with other evidence.").  The ALJ's decision to assign greater weight to Listenberger's treating psychiatrists at Park Center than to Dr. Huang's consulting opinion is supported by substantial evidence, and the Court will not accept Listenberger's invitation to merely reweigh the evidence in the hope that it will come out in her

favor this time. *See Cunningham v. Barnhart*, 440 F.3d 862, 865 (7th Cir. 2006) ("[W]e may not reweigh the evidence or substitute our judgment for that of the Commissioner."); *Dixon*, 270 F.3d at 1178 ("When treating and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence supports that decision.").

### E.  A Remand for Consideration of Additional Evidence is Not Warranted

Finally, Listenberger requests that the Court remand this matter to the Commissioner pursuant to the sixth sentence of 42 U.S.C. § 405(g) for consideration of the following evidence submitted after the ALJ issued his determination: a medical source statement penned by Dr. Wilkins on February 28, 2005, and a psychological evaluation performed by Dr. Kepes on April 29, 2005.  Despite Listenberger's assertion, a remand is not indicated on this basis.

The sixth sentence of 42 U.S.C. § 405(g) permits a remand "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  For sixth sentence purposes, "'materiality' means that there is a 'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered, and 'new' means evidence not in existence or available to the claimant at the time of the administrative proceeding." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997); *see also Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993).

Applying this legal standard here, it is clear that neither the medical source statement from Dr. Wilkins, nor the psychological evaluation performed by Dr. Kepes, serves as a basis for a remand, as Listenberger fails to show good cause why the information was not produced during the pendency of the proceedings.  As to the medical source statement, the record reflects

that Listenberger visited Dr. Wilkins regularly between May 2002 and October 2004 for various complaints.  Since she applied for DIB in November 2002 and the ALJ's opinion was not rendered until February 2005, Listenberger had *over two years* to request that Dr. Wilkins opine as to her physical limitations, yet she did not do so.

Likewise, Dr. Salazar commented in 2001 before Listenberger ever filed for DIB that she "seems to have below-average intelligence." (Tr. 325.)  Thus, Listenberger had *more than two years* after she filed her DIB application to seek out a consulting psychologist to administer intelligence testing before the ALJ rendered his opinion, yet she did not do so.  Clearly Listenberger's failure to timely seek out and include these additional opinions from Dr. Wilkins and Dr. Kepes does not now constitute good cause, as "such a rule would amount to automatic permission to supplement records with new evidence after the ALJ issues a decision in the case, which would seriously undermine the regularity of the administrative process." *Perkins*, 107 F.3d at 1296; *see also Sample*, 999 F.2d at 1144; *Keys v. Barnhart*, No. 01 C 8334, 2002 WL 31369793, at *8-9 (N.D. Ill. Oct. 21, 2002); *Romanoski v. Sullivan*, No. 91 C 8113, 1992 WL 346417, at *8 (N.D. Ill. Nov. 19, 1992) (failing to find good cause where claimant waited until after the ALJ's opinion was rendered to seek out a psychological evaluation, offering no explanation for his delay).

Accordingly, Listenberger's request for a sixth sentence remand to consider the medical source statement and psychological evaluation will be denied.

## VII.  CONCLUSION

As discussed herein, all of Listenberger's arguments come up short.  The ALJ did not commit an error that necessitates a remand when considering Listenberger's past work at step

four, nor did the ALJ abuse his discretion by rendering his opinion without ordering additional psychological testing.  Furthermore, the ALJ properly determined the credibility of Listenberger's testimony of debilitating limitations and adequately considered the medical source opinions of record.  Finally, since Listenberger has not shown good cause for her delay in producing additional evidence, a sixth sentence remand to consider such evidence is not indicated.

Therefore, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Listenberger.

SO ORDERED.

Enter for this 18th day of July, 2006.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge